UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

COREY LASHLEY,

                        Plaintiff,

                                                                          DECISION AND ORDER

                                                                          02-CV-6393L

                      v.

CORRECTIONAL OFFICER M. WAKEFIELD,
et al.,


                        Defendants.
_____

      This is a civil rights action brought pursuant to 42 U.S.C. § 1983, by a prisoner, Corey Lashley, who is confined with the New York State Department of Corrections ("DOCS") on a robbery conviction. Several of plaintiff's claims were dismissed by the Court in its summary judgment decision of May 2, 2005. The only remaining claim is plaintiff's claim that he was retaliated against by several employees of DOCS because he complained and filed a grievance concerning a policy that he disagreed with concerning procedures in the prison law library.

      The Court appointed counsel to represent Lashley and, thereafter, the parties consented to a bench trial. The matter was tried to the Court on April 16 and April 17, 2007. Three witnesses testified: plaintiff, Lt. Paul Piccolo and Retired Corrections Officer Marlene Wakefield. At the conclusion of plaintiff's case, the Court dismissed the claim against a third defendant, Gregory Sarra.

This Decision and Order constitutes the Court's findings of fact and conclusions of law pursuant to FED. R. CIV. P. 52.

Plaintiff testified that he was confined to the 5 Points Correctional Facility at Romulus, New York during 2001 and 2002. During some of that time, plaintiff was assigned to the law library as a law clerk.

The incident that precipitated the lawsuit occurred on October 8, 2001. Plaintiff testified that the officer in charge of the library, defendant Wakefield, advised all of the law clerks on October 8 that there was a new "policy" in effect. Inmates would routinely use law clerks to assist in researching and preparing legal filings. According to plaintiff, Wakefield told the clerks that they could only spend about 5 minutes with each client inmate.

Plaintiff testified that he disagreed with this policy and believed that there should be no time limits for consultation. He confronted Officer Wakefield and inquired about the new "policy" and requested to see a copy of it. Plaintiff claimed that Wakefield told him to file a grievance if he did not like the policy. That same day, plaintiff filed such a grievance (Ex. 1).

Both Lt. Piccolo and Wakefield testified that the new restriction only related to conferring with inmates behind the counter where the law clerks maintained their desks. As long as the consultation did not occur there, the inmate and the law clerk could confer in the library as long as necessary. It appears that plaintiff understood this part of the new policy since he describes it similarly in his grievance (Ex. 1). This policy, therefore, was not as restrictive as plaintiff originally claimed.

Plaintiff claims that Wakefield was upset when he challenged the new rule and claims that she filed a misbehavior report against him because of that irritation. Wakefield filed a misbehavior

report (Ex. 2A-B) charging plaintiff with failing to obey a direct order, harassment and related charges. The misbehavior report described Lashley's conduct as abusive and threatening toward her. Plaintiff admitted that he disputed the policy but denied that he acted improperly toward Wakefield. Wakefield, on the other hand, testified that plaintiff was very upset over her directive, was disorderly and was yelling at her. She feared for her safety. Because of that, she contacted her supervisor, Lt. Piccolo. Wakefield testified that she never had any prior problems with plaintiff and that the policy was issued by her superiors.

Lt. Piccolo was contacted that day and removed plaintiff from the library and confined him to his cell pending resolution of the misbehavior report. According to plaintiff, Piccolo told him that plaintiff was "crazy" for writing up, i.e. filing a grievance against, one of his officers and that he, Piccolo, would teach plaintiff a lesson. Plaintiff remained in keeplock for 8 days until the charges against him were dismissed (Ex. 5A-B).

Plaintiff filed another grievance (6A-6B) complaining of Wakefield's retaliatory conduct. Plaintiff admitted that he never had any more problems with Wakefield and that he returned to work in the library. At one point, Lt. Piccolo told plaintiff that he was too aggressive and confrontational with another officer in the library concerning the challenged library policy.

Plaintiff apparently showed that librarian Ex. 30 which was a response to one of his grievances about the library policy. Plaintiff claims that this decision vindicated him. I have reviewed plaintiff's Ex. 30, though, and it merely states in general that law clerks should have ample opportunity to assist inmates. The decision did not speak directly about the policy limiting law clerks from conversing with inmates at a particular location in the library.

Plaintiff also complained that his cell was searched more than normal after the October 8 incident. Plaintiff claimed that his property was tossed about the cell, which plaintiff believed was contrary to DOCS' regulations. Plaintiff was of the opinion that these frequent cell searches were caused by Lt. Piccolo.

There was testimony that after one of the cell searches, a misbehavior report was written against plaintiff on December 4, 2001 alleging theft of a library book. Plaintiff was confined in keeplock once again for about 10 days until the hearing when all charges were dismissed when it was established that plaintiff had borrowed the book from the library and had properly signed it out. (Ex. 10, Ex. 11A-B).

Several months later, another cell search occurred and, once again, plaintiff claims that his cell was trashed. During that search, two library books were seized.

In essence, plaintiff claimed that the misbehavior reports filed against him and the cell searches were all done in retaliation for his complaining about the new library policy that he had challenged.

Plaintiff admitted that he never had any problems with any of the defendants prior to these matters, and he admitted that when the issue first arose, Officer Wakefield did assure plaintiff that he could visit with inmates at other locations in the library but not where the clerks' desks were located. Plaintiff also admitted that he and Wakefield "exchanged words" and that the conversation might have been heated. Plaintiff admitted that he had no information that either Wakefield or Sarra had any connection with the cell searches.

Lt. Paul Piccolo testified that prior to October 8, 2001, he had no contact with plaintiff and did not know him. Piccolo was responsible for supervising the library. It was his decision to limit

the visits by inmates with clerks in their office area. The clerks were seated in a restricted area where books and other supplies were stored. There were issues of theft and this location was not easily observed by the officer in charge of the library. The new policy simply restricted general population inmates from spending excessive time in the law clerk area but did not limit the time law clerks could spend with inmates out in the library itself.

Piccolo testified that many cell searches are done randomly as selected by computer. If there is cause to believe there are problems though Piccolo had discretion to order a cell search. Piccolo did order such a search on December 4, 2001, because he had information that library books were missing and that Lashley was a suspect. In fact, one book was found which appeared to have been stolen, although it was later determined to have been properly signed out. Piccolo authorized another cell search when other books were missing and past due from the library. Those books were also found in plaintiff's cell. When this search occurred, plaintiff was not then assigned to work in the library and, therefore, in Piccolo's view he could not keep books in his cell for an extensive time.

DISCUSSION

At the outset, I recognized the Second Circuit's admonition that courts must approach prisoner claims of retaliation "with skepticism and particular care." *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir. 2001), *overruled on other grounds*, *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002). In affirming the district court's dismissal of such a claim, the Second Circuit listed all the reasons why retaliation claims such as the ones raised here are "easily fabricated" because they can be spawned after any adverse action taken against an inmate. *Dawes*, 239 F.3d at 491.

To establish a First Amendment retaliation claim, a plaintiff must show that "(1) his conduct was protected by the First Amendment, and (2) such conduct prompted or substantially caused defendant's action." *Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals*, 282 F.3d 83, 91 (2$^d$ Cir. 2002) (internal citations omitted).

A prisoner asserting a First Amendment retaliation claim must show that (1) the speech or conduct at issue was protected; (2) the defendant took "adverse action" against the prisoner; and (3) there was a causal connection between the protected speech and the adverse action. *See Gill v. Pidlypchak*, 389 F.3d 379, 380 (2$^d$ Cir. 2004), *Dawes*, 239 F.3d at 492. "Adverse action," defined objectively, is "retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights.'" *Gill*, 389 F.3d at 381 (quoting *Davis v. Goord*, 320 F.3d 346, 353 (2$^d$ Cir. 2003)).

In proving adverse action, a prisoner need not demonstrate an actual or subjective chill–that is, that he was dissuaded from further exercising his own rights. *Gill*, 389 F.3d at 384. In other words, in the context of prisoner retaliation suits, a prisoner need not demonstrate "actual chill." The issue is whether defendants engaged in retaliatory conduct that would "deter a similarly situated individual of ordinary firmness from exercising his constitutional rights." *Gill*, 389 F.3d at 381.

I find that plaintiff has failed to prove his claim by a preponderance of the evidence. I accept the testimony of the defendants and reject the testimony of plaintiff concerning his testimony about what defendants Wakefield and Piccolo allegedly said on the day of the incident.

There was adverse action taken against plaintiff after the October 8, 2001 incident in the library, but I am not convinced that those actions were motivated in any way by plaintiff's complaint to Wakefield about the rules in the library. I accept Ms. Wakefield's testimony, which I find

credible, that plaintiff's conduct was loud, abusive and threatening to her. She feared for her safety and, therefore, summoned her superior. I find as a fact that Ms. Wakefield filed her misbehavior report (Ex. 2A-B) because of plaintiff's inappropriate conduct and not for any retaliatory reason.

Wakefield and plaintiff had no prior history; in fact, it appears that she did not even know plaintiff. Even after the October 8 incident, plaintiff continued to work in the library and there were no further problems between him and Wakefield.

Plaintiff suggests that Wakefield filed the misbehavior report because she knew that plaintiff intended to file a grievance and that she wanted to cover her actions. I am not persuaded. Grievances are filed routinely in prison, and it was not such a significant event that caused Wakefield to retaliate. The matter made little lasting impression on Wakefield. At trial, she recalled very little about the incident and relied, for the most part, on the misbehavior report that she prepared at the time (Ex. 2A-B).

I had an opportunity to observe the demeanor of both plaintiff and Wakefield when they testified. Although plaintiff's deportment at trial was fine, there were occasions when he was argumentative with defense counsel and often cited DOCS' rules and directives that he believed controlled certain situations. Wakefield, on the other hand, was quite mild-mannered and petite. It is entirely reasonable to me that she may well have felt threatened by Lashley and it is also reasonable that plaintiff overreacted to what was a very modest policy change.

In any event, having listened to the testimony, considered all of the exhibits and all the facts and circumstances surrounding the case, I accept the testimony of defendants Wakefield and Piccolo and find their testimony to be credible both as to the events in question, the reason for the library

---

policy change and the fact that retaliation against Lashley played no part whatsoever in the actions of either Wakefield or Piccolo as a result of the October 8, 2001 incident.

I also find that the alleged conduct by the defendants was not such that would deter a similarly situated inmate from exercising his rights. *See Gill,* 389 F.3d at 381. The action certainly did not deter plaintiff from filing a series of grievances after the October 8, 2001 incident. Lashley has routinely filed such grievances. Although he was confined to his cell in keeplock for several days after misbehavior reports were filed, this time in the context of a maximum security prison is not so significant that it would have precluded an inmate from exercising his constitutional rights.

In sum, I find that no retaliatory conduct occurred; plaintiff has failed to prove by a preponderance that the defendant officers acted with any improper motive. Furthermore, even if plaintiff had proven some retaliatory motive, the adverse actions actually imposed were not sufficiently serious as to chill the exercise of any constitutional right.

## CONCLUSION

I find in favor of defendants and direct the Clerk to enter a NO CAUSE OF ACTION and dismiss the complaint in its entirety, with prejudice.

IT IS SO ORDERED.

_____
DAVID G. LARIMER
United States District Judge

Dated: Rochester, New York
April 20, 2007.